# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**SHIRLEY STONE,**

      **Plaintiff,**

**v.**                               **Case No. 3:12cv422RV/CJK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,[1]**

      **Defendant.**

_____/

# REPORT AND RECOMMENDATION

    This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying the claimant's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401-34.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), she is automatically substituted for Michael J. Astrue as the Defendant in this case.

## PROCEDURAL HISTORY

Plaintiff Shirley Stone, who will be referred to by name, as plaintiff, or as claimant, filed an application for DIB on June 26, 2007, alleging disability beginning on April 30, 2007. T. 100, 120, 128.[2] Her application initially was denied, and the denial was upheld on reconsideration. T. 38-39, 58-61, 133, 293-309. Claimant filed a request for a hearing. T. 5-7. Her request was granted, and a hearing was conducted on December 29, 2009. T. 8-37. On February 19, 2010, the administrative law judge ("ALJ") found that the claimant was not disabled as defined by the Act. T. 40-53. The claimant requested review by the Appeals Council, which denied her request on March 2, 2011. T. 1-3. The ALJ's decision thus became the final decision of the Commissioner on that date. T. 1-3. The claimant subsequently instituted this action, challenging the Commissioner's decision denying her application for benefits.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issues raised in this appeal, including the following:

• The claimant has the following severe impairments: acute, right middle cerebral artery distribution cerebrovascular accident (stroke) (20 C.F.R. 404.1520(c)). T. 45.

---

[2] The administrative record, as filed by the Commissioner, consists of twelve volumes (docs. 36-1 through 37-6) and has 576 consecutively numbered pages. References to the record will be by "T." for transcript, followed by the page number.

*Case No. 3:12cv422/RV/CJK*

• The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). T. 48.

• The claimant has the residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b). The claimant can frequently lift and/or carry ten pounds and occasionally lift and/or carry twenty pounds. She is limited from prolonged standing, more than thirty to forty-five minutes at a time, and can stand for a total of five to six hours out of an eight-hour workday, intermittently. She can sit for at least six hours out of an eight hour workday. T. 48.

• The claimant is capable of performing past relevant work as a cashier/parking lots and ticket seller – jobs which exist in the national economy and do not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565). T. 52.

• The claimant has not been under a disability, as defined by the Act, from April 30, 2007, through the date of the ALJ's decision. T. 53.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not

applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With regard to other standards of review, the Eleventh Circuit has advised that "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at 1439). Thus, although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).

In conducting its review, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.3d 1233, 1239 (1th Cir. 1983)). The court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). While review is deferential to a point, therefore, the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[3]

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision as to whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, the impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from performing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.[4]

Step five (or step four in cases such as the present one in which the ALJ decides a claimant can perform her past work) is where the rubber meets the road. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpreting (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). "[R]esidual functional capacity is the most [claimant] can still do despite [her] limitations."[5] 20 CFR § 404.1545(1). Often, both

---

[4] The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

[5] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 404.1512(c).) However,

the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by a disappointed claimant.

## FACT BACKGROUND AND MEDICAL HISTORY[6]

On April 30, 2007, the claimant and her husband, who alternated duties as truck drivers, were on a cross-country trip when they stopped at a rest area outside of Laramie, Wyoming, so the plaintiff could use the restroom and brush her teeth before beginning her shift. T. 12-13, 45. When the plaintiff returned to the truck, her husband noticed that she had chunks of banana all over her and that her left side "was just hanging." T. 13. When he asked her what was wrong with her arm, she told him "it didn't work." T. 13. The claimant's husband thus drove her to the nearest emergency room, where she was diagnosed with possible stroke and transferred by helicopter to the Swedish Medical Center in Denver, Colorado, for further treatment. T. 163, 168-69, 176. That the plaintiff had suffered a stroke was confirmed by a

---

before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons. (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[6] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record. Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

doctor at Swedish Medical Center, who diagnosed her with right middle cerebral artery stroke involving basal ganglia with left hemiparesis, left visual perceptual deficit, dysarthria, and dysphagia.[7]  T. 195.

On May 15, 2007, one week after she was discharged from Swedish Medical Center, the plaintiff followed up with her primary care physician, Dr. Stephen Jacobson, and reported that her left upper extremity was "still heavy and clumsy" and that her left lower extremity was "clumsy and weak."  T. 258.  Dr. Jacobson noted that the plaintiff's speech was "a bit slow," but that she had "no word finding problems."  T. 258.  She had "a bit of trouble" with left/right discrimination and some trouble chewing and swallowing."  T. 258.  She also had a "cautious gait" with left apraxia and weakness in her left fingers and ankle.  T. 259.  Dr. Jacobson prescribed Prozac for depression and Chantix for smoking cessation, as well as blood pressure and cholesterol medication; he also referred the plaintiff to an occupational therapist. T. 256, 259.

After seeing Dr. Jacobson, the plaintiff resumed physical and occupational therapy, which she had begun at Swedish Medical Center.  T. 268.  She responded well to physical therapy, but missed three of six sessions and then requested to be discharged for financial reasons.  T. 275.  Her primary goal with regard to occupational therapy was to return to truck driving with her husband.  T. 256.  She reported problems with memory, attention, and concentration and that she quickly fatigued when standing.  T. 256.  She also indicated that she was unable to read due to weakness in her left eye that caused words to run together and that she had

---

[7] The doctor noted that the plaintiff had a history of transient ischemic attacks, abnormal echocardiogram with right to left shunt and patent foramen ovale, hypertension, dyslipidemia, tobacco abuse, right renal cyst , and resolved thrush.  T. 195.

difficulty with tasks such as grooming, limited reading tolerance, and limited high level balance. T. 256, 262. On a scale of one to seven, with one being total assist and seven being complete independence, the plaintiff scored a five in feeding, a four in grooming, a five in bathing, a four in upper body dressing, a six in toilet transfer, and a five in tub transfer. T. 257. The therapist recommended that the plaintiff return for treatment once a week for eight weeks. T. 257.

During a June 15, 2007, visit with the occupational therapist, the plaintiff had no complaints of pain but reported that she tried to drive but had to stop. T. 260. She failed to show up for her appointments on June 21 and June 26. T. 263. She failed to show again on July 5, 2007, and advised her therapist that she wished to discontinue therapy for financial reasons. T. 265. The plaintiff was discharged and advised to follow up with her primary care physician for additional therapy once she resolved the financial issues.[8] T. 266.

The plaintiff saw Dr. Jacobson on June 19, 2007, at which time he noted that she was still smoking but was in a good mood and "doing well" with respect to both the depression and hemiparesis. T. 254-55. The Prozac had been a "big help" for the depression, and although the hemiparesis was much better, the plaintiff still had difficulty reading and was unable to drive because she got "too tired." T. 254. Dr. Jacobson advised the plaintiff to continue taking Prozac for nine months, return for a follow up visit in six months, and refrain from driving. T. 255.

On June 26, 2007, the plaintiff applied for DIB. T. 128. According to a Disability Report - Form SSA-3367, completed on June 27, 2007, the claimant had

---

[8] The therapist indicated on the discharge note that the plaintiff reported improvement in her left upper extremity. T. 266.

no apparent difficulty sitting, standing, or using her hands, but had trouble walking. T. 130. She still used a cane for ambulation and appeared to have limitations with the left side of her body. T. 130. During an interview on August 29, 2007, the plaintiff stated that she was able to walk using a cane, although she had balance problems and was required to use a motorized cart in the grocery store. T. 133. She advised that she suffered from depression and was taking Prozac, which helped, although she experienced symptoms of tearfulness and hopelessness. T. 133. She purportedly also suffered from fatigue and was largely confined to her home. T. 133. She reported that she was unable to multi task, had to focus on one thing at a time, and had weakness in her left side. Her speech was normal, but she seemed "somewhat depressed and tearful on the phone." T. 133.

On September 22, 2007, the plaintiff was evaluated by Riaz A. Naseer, M.D., who noted that she came to his office "walking rather slowly with a cane." T. 280. She had "slight difficulties" getting on and off the examination table but could walk independently, although she tended to have circumduction of the left foot. T. 280. She had difficulty in performing tandem, and her Romberg's sign was negative. T. 280. She was able to converse, and her speech was neither dysphasic nor dysarthric. T. 280. She was "aware of right and left." T. 280. A motor examination revealed 4/5 strength in the plaintiff's left upper and lower extremities with deep tendon reflexes of 1-2+ in both upper and lower extremities at biceps, triceps, brachial radialis, and knees. T. 280. The left plantar response was up-going, and she had no difficulty performing finger-to-nose-to-finger bilaterally but some difficulty in performing heel-to-knee-to-shin, particularly on the left side. T. 280. She was diagnosed with residual left homonymous hemianopia and very mild left hemiparesis with mild

difficulties in walking without a cane, although she was able to ambulate without a cane with circumduction of the left foot.[9]  T. 280-81.  According to Dr. Naseer, the plaintiff needed the cane for longer distances and when walking on uneven surfaces. T. 281.  In an addendum to his notes, Dr. Naseer opined that the plaintiff was able to use her hands for handling small objects but that her grip strength on the left side was 4/5 as a result of the stroke.  Dr. Naseer also noted that the plaintiff is right-handed. T. 285.

Five weeks after she saw Dr. Naseer, on October 29, 2007, the plaintiff had an ophthalmological evaluation and visual field examination by M. Ishaq Chisthi, M.D., who determined that she had peripheral vision field loss in the left eye, high myopia in both eyes, and congenital myelinated nerve fibers in the left eye and was unable to drive a truck.  T. 292.

A Psychiatric Review Technique was performed on the plaintiff on November 8, 2007.  T.  293-303.  The reviewer, Kyle DeVore, Ph.D., determined that the plaintiff had a non-severe impairment based on depression and anxiety.  T. 293, 295, 297.  According to Dr. DeVore, the plaintiff was mildly restricted in her activities of daily living, had no difficulty in maintaining social functioning, had mild difficulties in maintaining concentration, persistence, or pace, and had no repeated episodes of decompensation.  T. 301.  The claimant reported deficits in memory and concentration, but was able to answer questions and carry on a conversation; she demonstrated no difficulty with word-finding.  T. 303.  A recent neurological examination revealed no evidence of residual cognitive impairments "meeting

---

[9] The plaintiff also was diagnosed with hypertension, by history, and hypercholesterolemia. T. 281.

duration or warranting further evaluation." T. 303. Dr. DeVore thus recommended a finding of non-severe. T. 303.

William Hughes, a medical consultant for the office of disability determinations, completed a Physical Residual Functional Capacity Assessment on November 8, 2007, for the period of April 30, 2007, through April 30, 2008. T. 304-309. Hughes found that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and/or pull without any additional restrictions. T. 305. She could occasionally climb, balance, stoop, kneel, crouch, and crawl and had no manipulative, visual, or communicative limitations. T. 307. She was required to avoid concentrated exposure to hazards, including machinery and heights. T. 308. He noted that the plaintiff was able to walk independently and had motor strength of 4/5 with findings of mild left hemiparesis but needed a cane to walk longer distances and on uneven surfaces. T. 305. According to Hughes, the plaintiff had 4/5 grip on the left hand but was able to use her hands for handling small objects. T. 305. She had left hemianopsia that did not meet a listing and acuity within normal limits when corrected. T. 305. Hughes found the plaintiff's allegations regarding left-sided weakness credible and consistent with the evidence. T. 308.

The plaintiff admitted herself to St. John's Mercy Medical Center on March 17, 2008, as a result of worsening depression. T. 571-72. She reported that she had been suffering from intermittent depression since May 2007, but had been doing "very well" with Prozac, which had worked "great." T. 573, 575. Over the past few days, however, she had been increasingly depressed and suicidal. T. 573. She contacted

her primary care physician to see if her Prozac dosage could be increased, and he recommended that she go to the emergency room. T. 573. When she arrived at the emergency room, the plaintiff indicated that she had suicidal ideation and thoughts of wanting to hurt herself. T. 573. She stated that she had undergone a lot of changes since her stroke in that she no longer was able to work as a truck driver with her husband and had family discord following the death of her father in December 2006. T. 573. She also reported fear of suffering another stroke and over $200,000 in debt. T. 573. She was treated by Edward L. Garcia-Ferrer, M.D., who diagnosed her with major depressive disorder, recurrent, and a history of alcohol and crystal meth abuse.[10] T. 572. Her Prozac was increased from 20 mg. to 40 mg., and she was treated with one-to-one individual psychotherapy, group therapy, lectures, and the "milieu" of the inpatient program. T. 572. According to the treatment notes, during the course of her overnight stay, the plaintiff was "doing better and was consistently denying any suicidal or homicidal ideation, plan, or intent." T. 572. Her affect was appropriate, and her mood was "okay." T. 572. She was discharged with instructions to follow up on March 27, 2008.[11] T. 572.

When the plaintiff saw Dr. Garcia-Ferrer on March 27, her mood was good, she was euthymic, and her speech and motor function were normal. T. 569. She was slightly depressed, but had no anhedonia, thoughts of death, or suicide ideation. T. 569. Her activity level was slightly decreased and she was restless and having difficulty sleeping; she also had slightly decreased concentration. T. 569. She was

---

[10] Apparently, the plaintiff had an alcohol and drug problem in the past. T. 573.

[11] The doctor noted that the plaintiff had a history of stroke "with no residual changes." T. 575.

scheduled to return in four weeks and advised to undergo weekly psychotherapy. T. 570. When the plaintiff next saw Dr. Garcia-Ferrer, on April 24, 2008, her mood was normal and she had no anhedonia, feelings of worthlessness, thoughts of death, or suicide ideation. T. 567. Her appetite was slightly decreased, but her activity level and sleep were normal. T. 567. She had normal to slightly decreased concentration, but no fatigue or restlessness. T. 567. Her speech was normal, but her motor function was slowed. T. 567. She reported that she was going out of town for three months to take care of her grandchildren and was scheduled to return thereafter. T. 567-68.

The plaintiff saw Dr. Garcia-Ferrer again on August 6, 2008. T. 565. Her mood was normal and she had no anhedonia, feelings of worthlessness, thoughts of death, or suicide ideation. T. 565. Her activity level was slightly decreased, however, and she was having difficulty sleeping and slightly decreased concentration. T. 565. Her speech and motor function were normal, but she was nervous and anxious. T. 565. She was scheduled to return on October 2, 2008. T. 565. On that date, the plaintiff was moderately depressed, slightly anhedonic, had a flat affect, and had slight feelings of worthlessness. T. 563. She had no thoughts of death or suicide ideation and a normal activity level. T. 563. She was experiencing insomnia and slight fatigue and had slightly decreased concentration. T. 563. Her speech and motor function were normal. T. 563. She was advised to return in two months, but apparently did not make it to her next appointment. T. 561.

On February 2, 2009, the plaintiff began seeing a new primary care physician, David J. Brown, M.D. T. 323. During the initial visit, Dr. Brown noted that the plaintiff had hypertension that was stable. T. 323. According to Dr. Brown, her risk

factors included depression, an inactive lifestyle, smoking, and obesity. T. 323. Dr. Brown noted that the plaintiff had mild hyperlipidemia that was controlled with medication and depression, having recently been admitted for suicidal ideation. T. 323. According to Dr. Brown, the plaintiff's extremities appeared normal and she had no fatigue and no unusual anxiety or evidence of depression. T. 324-25.

The plaintiff returned to Dr. Garcia-Ferrer on February 5, 2009. Dr. Garcia-Ferrer noted that the plaintiff's mood/spirits were cyclical and that she had slight anhedonia, a slightly decreased appetite, and slight feelings of worthlessness. T. 559. She was euthymic, however, and had no thoughts of death or suicidal ideation, although her level of activity was slightly decreased. T. 559. Her sleep, speech, and motor function were normal, but she had slightly decreased concentration, slight fatigue, and was slightly restless and irritable. T. 559. She was scheduled to return in three months. T. 560.

The plaintiff had a CT scan on February 12, 2009, which revealed areas of old infarcts in the right basal ganglia and right periventricular, but no intracranial hemorrhage. T. 520. The plaintiff also had an MRI of her brain, which revealed areas of abnormal signal intensity at the right basal ganglia involving the posterior aspect of the lentiform nucleus, caudate, and right periventricular white matter consistent with old hemorrhagic infarcts. T. 522-23. Notably, however, there was no evidence of acute infarct. T. 522. Her chief complaint that day was numbness of the face – in particular, the left side of her mouth; she also complained of numbness in her arms and three of her fingers on her left hand and that she had begun drooling

and had mild weakness of her left arm and leg.[12] T. 524, 531. There was slight to mild pronator drift in her left upper extremity, along with a slight decrease in function in the left upper and lower extremities, and her left hand grasp was 4+/5. T. 532. There also was a slight decrease in sensation and slight weakness in her left leg. T. 532. She had no psychological complaints, a normal affect, and appropriate mood and behavior. T. 525, 532. Her symptoms completely resolved while she was in the emergency room, and she was diagnosed with transient ischemic attack. T. 537.

The plaintiff presented to the emergency at Barnes Jewish West Community hospital on April 4, 2009, complaining of a headache.[13] T. 501. She had a CT scan of her head, which revealed no acute hemorrhage but an old infarct involving the right basal ganglia. T. 500. She was diagnosed with recurrent migraine headache. She had no anxiety or depression, however, and a normal affect with appropriate mood and behavior. T. 505-06. T. 510. The plaintiff returned to Dr. Brown on April 10, 2009, complaining of daily migraine headaches that lasted more than an hour.[14] T. 320. Dr. Brown noted that the plaintiff's extremities appeared normal and that she had no motor weakness. T. 321. He also noted that she had no fatigue and "no unusual anxiety or evidence of depression." T. 321. After observing that the prior CT scan was negative, Dr. Brown diagnosed the plaintiff with likely migraines

---

[12] Interestingly, the notes reflect that the plaintiff had "minimal residual numbness andor weakness left side." T. 531.

[13] According to the notes, the plaintiff had been experiencing "intermittent headaches" for the past ten days, which were relieved with Excedrin Migraine. T. 501.

[14] Claimant described the headaches as "blinding, pressure, and throbbing," with associated symptoms of nausea, phonophobia, photophobia, and vomiting. T. 320.

and possibly a cluster headache and gave her samples of Maxalt and a prescription for Fioricet.  T. 322.

The plaintiff again sought emergency treatment for a migraine headache on April 15, 2009.[15]  T. 333.  She had another CT scan of her head, which revealed no significant changes from the February 12 MRI and April 4 CT scan.  T. 333, 479. The plaintiff informed the treating physician that she had been given a few samples of Maxalt and took them several days ago, which "really helped her head."[16]  T. 481. She was diagnosed with recurrent migraine headache, instructed to follow up with her primary care physician or neurologist, and told that she could return to work in two days.  T. 335, 337.   The plaintiff visited Dr. Brown again on April 20, 2009, complaining of continued severe headaches.  T. 317.  Dr. Brown noted that the plaintiff's extremities appeared normal, her memory was intact, and she had no motor weakness and no fatigue.  T. 317, 318.  He also noted that the plaintiff's hypertension and hyperlipidemia were controlled.  T. 319.  Finally, he noted that the plaintiff's headaches improved with Maxalt and thus may have been migraine/vascular.  T. 319. He referred the plaintiff to a neurologist and indicated that she needed an MRI of her brain.  T. 319.  The MRI was performed on April 21 and revealed no abnormalities other than an "[u]nchanged old hemorrhagic infarct in the right basal ganglia."  T. 330.

---

[15] The plaintiff complained of numbness in her right ear and informed the attending physician that she feared she was having another stroke.  T. 481.  The doctor noted that she was anxious and jittery.  T. 481-82.  He also noted that she had normal motor activity and a normal gait.  T. 483.

[16] According to the doctor's notes, the plaintiff reported that the Maxalt "completely killed" her headache.  T. 487.

When the plaintiff next saw Dr. Garcia -Ferrer, on May 7, 2009, her mood and spirits were normal and she was euthymic, but slightly depressed.  T. 557.  She had no anhedonia, feelings of worthlessness or guilt, thoughts of death, or suicide ideation.  T. 557.  Her activity was slight, but her sleep was normal and she had normal to slight fatigue and slightly impaired concentration.  T. 557.  She also was slightly restless, but her speech and motor function were normal.  T. 557.

The plaintiff visited the emergency room on June 2, 2009, complaining of a migraine headache.  T. 440.  Her affect, mood, and behavior were appropriate, although she was a bit anxious.  T. 440-41, 452.  The plaintiff was diagnosed with a headache and discharged with instructions to follow-up with Dr. Brown.[17]  T. 453.  The plaintiff returned to the emergency room one week later, complaining of another migraine headache.  She had no amnesia and no fatigue, anxiety, or depression; her affect was normal and her mood and behavior were appropriate.  T. 420-22, 427-28.  She was diagnosed with a migraine headache and discharged.  T. 430.

On July 22, 2009, the plaintiff visited a neurologist,  Eliahu Feen, M.D., for "chronic followup of what [was] described as a 'full blown stroke."  T. 338.  Dr. Feen noted that the claimant and her husband reported that they were "finally bankrupt," having incurred over $200,000 in medical bills as a result of the claimant's stroke, and that the claimant was unable to work and had been denied disability benefits.  T. 339.  The plaintiff reported having chronic headaches; trouble with balance/coordination/speech/comprehension/strength in arms or legs/paresthesias; a chronic cough; fatigue; severe depression, mood swings, and anxiety, for which she

---

[17] According to the treatment notes, there was a high probability that the plaintiff was experiencing a tension headache and a moderate probability that it was a migraine.  T. 454.

had been treated with medication; treatment for a psychiatric disorder; emotional lability; short-term memory problems; migraine headaches since her stroke; and a history of suicide attempt since her stroke, for which she was hospitalized.  T. 339-40.  Upon examination, Dr. Feen observed no neurological deficits.  T. 340-41.  He was unable to determine a diagnosis for or etiology of the plaintiff's "[s]troke-like episode" and requested her previous medical records.  T. 341.  After reviewing the records, Dr. Feen diagnosed chronic ischemic stroke of the right basal ganglia with residual left hemiparesis.  T. 345.  He opined that the plaintiff's stroke was due to a penetrating artery secondary to underlying hypertension and tobacco use.  T. 345.

The plaintiff next saw Dr. Garcia-Ferrer on August 13, 2009, at which time her mood was good, her spirits were normal, and she was euthymic.  T. 555, 558.  She had no anhedonia, thoughts of death, or suicidal ideation.  T. 555.  Her sleep and activity were normal; her concentration was slightly decreased, but she had no fatigue.  T. 555.  Her speech and motor functions were normal.  T. 555.

The plaintiff visited the emergency room again on September 18, 2009 – this time by ambulance – complaining of dizziness, tingling in her hand, and nausea.  T. 394.  According to the treatment notes, the plaintiff had no fatigue, anxiety, or depression; she had a normal affect, and her mood and behavior were appropriate.  T. 399-400.  A CT scan of her head revealed no acute intracranial hemorrhage, extra-axial collection, or mass-effect.  T. 415.  The only findings were an unchanged chronic infarct in the right corona radiata and lentiform nucleus.  T. 415.  The plaintiff was diagnosed with vertigo and advised to follow up with her primary care physician.  T. 404.

On October 2, 2009, the plaintiff visited Anne M. Woodruff, FNP, complaining of vertigo. T. 314. According to Woodruff, the plaintiff's symptoms, which consisted of light-headedness, were moderate and occurred intermittently.[18] T. 314. Woodruff noted that the plaintiff's extremities appeared normal; her balance, gait, and coordination were intact, although she had chronic left-sided weakness; and she had no fatigue. T. 314-15. Woodruff ordered an MRI of the plaintiff's brain and an ultrasound of her carotid arteries to determine whether she was having another stroke or transient ischemic attack. T. 315-16. The ultrasound revealed no plaque or stenosis, and the MRI revealed no acute intracranial findings. T. 367-68.

The next day, on October 3, 2009, the plaintiff again arrived at the emergency room by ambulance, complaining of tingling in her arms and legs and tingling and numbness in her lips. T. 370, 374. She also was lightheaded, but had no fatigue, anxiety, or depression; her affect was normal, and her behavior was appropriate. T. 374-75. A CT scan of her head revealed no acute intracranial abnormality. T. 390. She was diagnosed with paresthesia, prescribed Ativan, and discharged home. T. 380. The plaintiff visited Dr. Brown on November 3, 2009, complaining of a mild, non-productive cough that had lasted for four weeks. T. 311. Dr. Brown noted that the plaintiff's extremities appeared normal and that she carried a cane and had no fatigue. T. 311-12. He also noted that her hypertension and hyperlipidemia were controlled. T. 312. The plaintiff saw Dr. Garcia-Ferrer a couple of weeks later, on November 19, 2009, at which time she was moderately depressed and slightly anhedonic. T. 553, 556. She had slight feelings of worthlessness, but no thoughts of

---

[18] Associated symptoms included nausea, paresthesias, and weakness. T. 314.

death or suicidal ideation. T. 553. She reported slight and decreased activity and concentration and slight fatigue. T. 553. Her speech and motor function were normal, but she had a flat affect. T. 553. She was advised to follow up in three months.[19]

## HEARING BEFORE THE ALJ

Ms. Stone testified on her own behalf at the ALJ hearing conducted on December 29, 2009. T. 8-37. At that time, the plaintiff was forty-six years old; five feet, five inches tall; weighed 200 pounds; and was right-handed. T. 11. She had completed high school and two years of college and had held a number of jobs, the most recent of which were as a truck driver and assembly line worker. T. 11, 12. The plaintiff's last day of work was April 30, 2007, the date of her stroke. T. 13. The plaintiff testified that the stroke affected the left side of her body, including her arm and leg. T. 14. Immediately after it occurred, she had difficulty speaking and

---

[19] In an undated and unsigned/unverified disability appeal report, which appears to have been prepared in or after October 2009, the plaintiff stated that she was "under psychiatric care for suicidal thoughts" and was seeing a neurologist as a result of her stroke. T. 137-38. In response to questions asking whether she had any new physical or mental limitations or conditions, she replied in the affirmative and stated that she had suicidal tendencies, vertigo, and short-term memory loss, beginning in January 2008. T. 138. She also indicated that, since she last completed a disability report, she had been treated for conditions and emotional or mental problems that limited her ability to work. T. 138. When asked how her illnesses or conditions affected her ability to care for her personal needs, the plaintiff stated that she could not do her hair or makeup, had a hard time using her hands, could not sit or stand for very long, got dizzy easily and needed to lie down, was not supposed to drive, could not recall what she read, and could not do data entry. T. 142. In an undated and unsigned form asking about her recent medical treatment, the plaintiff stated, among other things, that Dr. Brown told her that her walking was not going to improve and that things were "as good as they [were] going to get." T. 151. She also stated that Dr. Garcia diagnosed her with severe depression and advised her to see a psychologist and continue taking medication to prevent suicidal tendencies. T. 151.

walking and was unable to use the restroom without assistance. T. 14-15. She began physical and occupational therapy at Swedish Medical Center and resumed therapy when she returned home. T. 15-16. Although the plaintiff had significantly improved after seven months, at which point she was able to independently tend to her own personal hygiene, she still had to remind herself how to walk properly with her left foot to avoid having her ankle fold. T. 15-16, 20-21.

As of the date of the hearing, the plaintiff was able to stand for thirty minutes at a time but then had to sit down and rest for five to ten minutes. She was not in pain, but was weak. T. 16. She also drooled. She testified that the left side of her body "gets real heavy feeling . . . almost like [she is] carrying a heavy weight."[20] T. 17. She was able to grip with her left hand and move her fingers, but had weakness in her left arm. When asked how the physical effects of the stroke had impacted her, she testified that she did not "really do much of anything." T. 18. She also said that "[e]verything takes longer" than it did before her stroke. T. 18. She cooked for herself, but had to "space things out" and rest before she cleaned up. She had difficulty cutting meat while sitting, but was able to "do pretty good" when standing at a counter. T. 19. She could lift her seventeen-pound dog "pretty good," but did not lift anything "over that." T. 19. After nine months, she was able to resume

---

[20] She acknowledged, however, that she is a "heavy person" and thus is "carrying a heavy weight." T. 17.

driving, at least within a ten-mile radius.[21]  T. 20.  At the time of the hearing, she drove a pickup truck.  T. 20.

The plaintiff testified that she practically collapsed every day from exhaustion and had to take at least a three-hour nap some time after 1:00 p.m.[22]  She typically awoke from her nap around 6:30 or 7:00 p.m. and went back to sleep around 11:00 p.m.  T. 17.  When asked whether the stroke impacted her thought processes, the plaintiff responded in the affirmative, explaining that she could  no longer "multi-task" and had to "really concentrate" on what she was doing – everything from paying bills to taking medications.  T. 14-15.  She also indicated that she had memory problems as a result of the stroke.[23]  T. 15.  She was taking a number of medications, including Lisinopril for high blood pressure, Simvastin for high cholesterol, aspirin for blood thinning, Ativan for anxiety, Lexapro for depression, and Traxodone as a sleep aid.  T. 23.  She recently was prescribed medication for vertigo.[24]  T. 23.

---

[21] The plaintiff testified that Dr. Jacobson gave her permission to drive within a ten-mile radius of her home.  When asked about the reason for the limitation, she testified that she was "getting tired and possibly collapsing or having another stroke."  T. 21.  She also said that she was having "a lot of anxiety about driving.  T. 21.

[22] According to the plaintiff, if she did not take a nap, she would fall asleep in a chair.  T. 25.

[23] When asked about her memory, the plaintiff testified that she could not read a book or watch a movie without having to go back over what she just read or saw.  T. 22.  She testified that her long-term memory was only slightly affected by the stroke and was not as bad as her short-term memory.  T. 22.  She was not sure whether the difficulties were caused by a lack of focus or memory deficit.  T. 22.

[24] The plaintiff testified that she was instructed to take medication for vertigo when symptoms appeared and that the medication took effect approximately thirty to forty minutes after she took it and made her "sleepy."  T. 26.

The plaintiff explained that she was hospitalized in March 2007 for suicidal ideation and depression. T. 24. She was taking Prozac at the time, but thought it had quit working. T. 24. She called Dr. Jacobson, who instructed her to go to the hospital for a medication adjustment. T. 24. After checking herself into Mercy Medical Center, she was seen by Dr. Garcia-Ferrer, who informed her that her feelings were not uncommon. She continued to see Dr. Garcia-Ferrer every two to three months for adjustment of her medication, which helped her moods and prevented her from crying as much and wanting to kill herself.

When asked about her ability to work, the plaintiff testified that she could not work as a cashier because of the speed required. According to the plaintiff, she could not "do anything fast anymore" and could no longer us both hands. T. 25. Her standing limitation also precluded her from working as a cashier and as an assembly line worker. T. 26. She was further precluded from assembly line work because she could not pull tools down from the ceiling or torque. T. 27. The plaintiff testified that she could not perform clerical work because she could no longer type efficiently, and her memory precluded her from working as a waitress. T. 27. She indicated that her vision had improved but that she nevertheless was unable to drive a truck because she could not "raise [her] left leg to make the steps and pull [herself] up." T. 27-28. She was able to walk short distances, such as from a parking lot to a building, but had to sit down after walking "anything over 30 minutes." T. 28. She could not squat, bend, or kneel because she lacked the strength to lift herself back up. T. 28. The plaintiff testified that her depression also interfered with her ability to work because she cried and knew that she could not "do as good a job as what [she] use [*sic*] to do." T. 29. When her attorney asked her if she had difficulty or anger issues because of

the depression, the plaintiff explained that she got short-tempered but that her doctor advised her that she would improve in that regard with medication. T. 29. As far as her ability to tend to her everyday needs, the plaintiff testified that she could wash and dry her hair, but could not use an iron and relied, at least at times, on her daughter-in-law to fix her hair. T. 30-31.

Jeffrey Megrowski appeared at the hearing as a vocational expert. The ALJ asked Megrowski whether the plaintiff would be able to perform jobs in the lighter sedentary category, as she had done in the past, or unskilled jobs if she was restricted to sedentary work or required to alternate between sitting and standing throughout the work day and not able to fully use her left arm. Megrowski testified that, in certain situations, the plaintiff could perform cashiering work. T. 32-33. He explained that there are some sit-down cashier jobs, such as in parking lots and ticket sales. T. 34. According to Megrowski, those types of jobs would be the only past work the plaintiff could perform. T. 34. In his opinion, assembly work would be problematic for the plaintiff because of the bilateral dexterity required. T. 34. He opined, however, that the plaintiff could work as an information clerk, providing directions in a shopping mall or checking people in at a large building; as a children's attendant; or as a furniture rental consultant. T. 34-35. When asked if short-term memory problems would affect performance of those jobs, Megrowski testified that he thought the plaintiff would be unable to perform the jobs if she could not retain information recently conveyed to her. T. 35. He clarified, however, that the parking lot attendant and ticket seller jobs might not involve a constant flow of people, depending on the plaintiff's work schedule. T. 35-36. Finally, Megrowski testified that if the plaintiff

were required to rest for three to four hours during the day, she would be limited to part-time work.  T. 36.

ANALYSIS

The claimant argues that the ALJ erred in failing to credit the findings of her treating physician, Dr. Brown, in finding that her depression and anxiety were non-severe.  The issue, as phrased, implicates the treating physician rules.  Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-61 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  *Phillips*, 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ will give it controlling weight.  20 C.F.R. § 404.1527(c)(2).[25]  Where a treating physician has merely made conclusory

---

[25]The cited regulation embodies the treating physician rule:

(2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such

statements, however, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987). It is not unlawful "to discredit the opinion of an examining or treating physician so long as the Commissioner specif[ies] what weight

---

as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

is given to a treating physician's opinion and any reason for giving it no weight . . . ." *Id.* (internal marks omitted).

In this case, Dr. Brown diagnosed the plaintiff with a number of conditions, including depression and anxiety. He offered no opinion, however, as to the severity of the conditions and imposed no restrictions on the plaintiff's ability to work. There is no indication, therefore, that the ALJ failed to credit the findings of Dr. Brown. Moreover, the ALJ's finding that the plaintiff's depression and anxiety were non-severe is supported by substantial evidence in the record.

Mental impairments must be evaluated according to specific procedures set forth in the regulations. *See* 20 C.F.R. § 404.1520a; 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 *et seq*. Listing 12.00 addresses various potentially disabling mental impairments and requires evaluation of two sets of criteria known as "Paragraph A" and "Paragraph B" criteria. Paragraph A criteria relate to medical findings. Paragraph B criteria address impairment-related functional limitations in four broad functional areas: activities of daily living; social functioning; concentration, persistence and pace; and repeated episodes of decompensation (*see, e.g.*, Listing 12.00C). Generally, a mental impairment is deemed non-severe at step two if the degree of limitation in the first three functional areas is "none" or "mild" and the degree of limitation in the fourth area is "none", "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

Here, the ALJ found that the plaintiff suffered from medically determinable mental impairments of depression and anxiety. He concluded, however, that the conditions caused only minimal limitation on the plaintiff's ability to perform basic

mental work activities. T. 46. In so finding, the ALJ relied on the objective evidence in the record, including the Psychiatric Review Technique completed on November 8, 2007, in which Dr. DeVore opined that the claimant's depression and anxiety were non-severe and controlled with medication, and Dr. Naseer's neurological evaluation referenced therein, which revealed no evidence of a residual cognitive impairment that would meet the duration requirement of a severe impairment or warrant further evaluation. The ALJ also pointed to the portions of the record that demonstrate that the plaintiff improved with treatment. T. 46. Specifically, the ALJ noted that although the plaintiff was admitted for inpatient treatment in March 2008 for evaluation of suicide risk, she was discharged the next day upon reporting significant improvement and lack of suicidal intent. A mental status examination showed normal psychomotor activity, speech, fair insight and judgment, and that her recent, immediate, and remote memory were within normal limits. As the ALJ further observed, Dr. Garcia-Ferrer consistently noted that the plaintiff exhibited either no symptoms of depression or was only slightly impaired. On one occasion, he noted that the plaintiff was moderately depressed, but there was no indication that the plaintiff's depression – on that date or any other – interfered in any way with her ability to work. During an April 10, 2009, visit, Dr. Brown observed that he plaintiff had "no unusual anxiety or evidence of depression." T. 46.

In finding that the plaintiff's depression and anxiety were non-severe, the ALJ also considered the four functional areas. With regard to the first area, activities of daily living, the ALJ determined that the claimant had mild limitation. In so finding, the ALJ relied on Dr. Garcia-Ferrer's findings, including that the claimant's mood was normal, there were no signs of anhedonia, her weight and appetite were stable,

and her levels of activity and fatigue were only slightly reduced. T. 47. The ALJ also noted that the claimant gradually resumed driving short distances and could tend independently to her personal hygiene. T. 47. With respect to the second functional area, social functioning, the ALJ correctly found that the plaintiff had no limitation. T. 47. Turning to the third functional area, concentration, persistence, or pace, the ALJ found that the claimant had mild limitation. As the ALJ observed, although the claimant testified that her concentration and memory were reduced following her stroke, there was no evidence that she suffered more than slight or moderate reduction in that regard. Finally, the plaintiff had no episodes of decompensation and thus no limitation in the fourth functional area. Because the claimant's medically determinable mental impairments caused no more than "mild" limitation in the first three functional areas and no limitation in the fourth functional area, the ALJ found them non-severe. T. 47. The ALJ applied the correct legal standard in arriving at his conclusion in that regard, and his finding is supported by substantial evidence in the record.

The plaintiff also argues that the ALJ failed to evaluate the effects and limitations imposed by her combination of impairments.[26] "Where a disability claimant has alleged several severe impairments, the Secretary has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled." *Jones v. Dep't of Health and Human Servs.*, 941 F. 2d at 1533; *see also Jones v. Bowen* 810 F. 2d 1001,1006 (11th Cir. 1986) ("It is now

---

[26] Although the plaintiff argues that the ALJ erred in failing to consider the effect of the combination of her impairments, she focuses on the effects of her depression and loss of peripheral vision in her left eye.

well settled that the ALJ must consider the combined effects of a claimant's impairments in determining whether he is disabled."). As applied by the Eleventh Circuit, this rule requires the ALJ to "consider every impairment alleged." *Gibson v. Heckler*, 779 F. 2d. 619, 623 (11th Cir. 1986). In other words, the ALJ maintains the duty to make "findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled." *Bowen v. Heckler*, 748 F. 2d 629, 635 (11th Cir. 1984); *see also Walker v. Bowen*, 826 F. 2d 996 (11th Cir. 1987). A statement by the ALJ that, "based upon a thorough consideration of all evidence, the ALJ concludes that [claimant] is not suffering from any impairment, *or a combination of impairments* of sufficient severity to prevent him from engaging in any substantial gainful activity for a period of at least twelve continuous months[,]" will suffice to demonstrate that the ALJ "has considered the combination issue." *Wheeler v. Heckler*, 784 F. 2d 1073, 1077 (11th Cir. 1986).

In this case, the ALJ found that the claimant does not have a combination of impairments that meets or medically equals a listed impairment. T. 48. In reaching his conclusion in that regard, the ALJ focused on the plaintiff's stroke symptoms. Although the ALJ did not specifically address all of the plaintiff's medical conditions, the court finds that the evidence of record does not support the limitations urged by the plaintiff. In particular, the court notes that the renal cyst on the plaintiff's right side and the patent foramen ovale required no treatment and apparently imposed no limitations. The hypertension and hypercholesterolemia were benign and stable; and a tomography, CT scan, MRI, laboratory studies, EKG, and carotid Doppler revealed no new or significant findings contributing to the plaintiff's blurry/double vision, headaches, paresthesia, and vertigo. Moreover, the plaintiff suffered from only mild

paresthesia, and Maxalt was effective at controlling her migraine headaches, which likely were the result of tension, neck strain, or benign positions. T. 405, 454, 472. She also was prescribed medication for vertigo. Although the record arguably supports a finding that the plaintiff maintained a loss of peripheral vision in her left eye, there is no indication that loss impacted her beyond her ability to drive a truck, as to which the ALJ found her incapable. And there is no evidence that the plaintiff's depression limited her ability to work, alone or in combination with any of her other impairments, including her loss of peripheral vision. Contrary to the plaintiff's assertions, therefore, the ALJ did not err in finding that the plaintiff's combination of impairments did not meet or medically equal a listed impairment.[27]

For the reasons set forth above, the undersigned concludes that the Commissioner applied the correct legal standards in rendering his decision in this matter and that his decision was supported by substantial evidence.[28] *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

---

[27] Even if the ALJ erred in failing to expressly address all of the plaintiff's impairments in finding that she suffers from no combination of impairments that meets or medically equals a listed impairment, any such error was harmless because the ALJ addressed each of the plaintiff's conditions in his decision – and thus considered them – and the record supports the ALJ's conclusion. *See* Fed. R. Civ. P. 61; *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error doctrine in the context of a social security case).

[28] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

ACCORDINGLY, it is RECOMMENDED:

1.  The decision of the defendant Commissioner be AFFIRMED and plaintiff's application for Disability Insurance Benefits be DENIED.

2.  The clerk be directed to close the file.

At Pensacola, Florida, this 13th day of January, 2014.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**